Good morning. Are you both ready to proceed? First let me apologize. I appreciate that we started a little bit late for our 930 case, but the first case did go exceptionally long. It was a very interesting issue. So, ladies, if you're ready to proceed. Good morning, Your Honors. Counselor, may it please the Court, my name is Sherry Silvern and I represent Scott Peters on behalf of the State Appellate Defender in this appeal. Your Honors, Scott Peters is not and was not an easy client to represent. The nature of his offenses, the charge of offenses, made it difficult for everyone involved, and the record shows a man who was brash, distrustful, demanding, possibly bordering paranoia, possibly having been diagnosed as suffering from post-traumatic stress disorder, and he could probably be described as a survivor. The motions he filed pro se reflect, in the language that he used in those motions, a bitterness and a pessimism about the court system and law enforcement. There's no denying that. But none of that means that he was entitled to anything less than any other person charged with a criminal offense. He was entitled to have a representative of the state who may be allowed to strike hard blows, but who would nevertheless remain fair in the prosecution of this case. He was entitled to representation of counsel that would be reasonable, effective, and zealous. He was entitled to a judge who would preside in a patient and dispassionate manner. He was entitled, in short, to a fair trial. Scott Peters got none of these things. In this appeal, we've raised six issues that illustrate these failings, and I'd like to focus only on two of them today. The first argument that I'd like to focus on is issue four in the brief, and in that issue we've argued that Mr. Peters was denied his right to confront witnesses when he was involuntarily removed from the courtroom on the beginning of the second day of trial. Now, the prosecutor and the court below have attempted to make it seem like this was a voluntary decision on his part to leave the courtroom. In fact, it was not, and there's plenty of evidence in the record to show that it was not a voluntary leaving of the courtroom. It was not a refusal on his part to be in the courtroom. We have the videos that were taken in the jail. We have the body cam. I'm not sure which officer had the body cam on, but there was a body cam on that followed him from his cell through trying to get dressed, falling face first off the bench as they were trying to get him dressed for court. All the time he was hollering in pain. Several times throughout the videos, you can see on his lower right abdomen that there was a huge hernia extending. You could see it clear as day. He was examined by Nurse McKay, correct? He was examined by Nurse McKay, but that raises several questions. And she testified? She testified before Judge Prater, yes. She told Judge Prater that she believed that, she said that he had this hernia, she was aware of it, they knew of it, and that he, she told him that, she told the Judge Prater that she believed he was using muscles that he had not used enough before in an attempt to apparently vomit prior to coming into court. There was on the floor of his jail cell some liquid of some type by his mouth when they found him in his jail cell laying on the floor of the cell. His pants were partly down by his thighs. We don't know what that liquid was. Nobody said. Did she say he was attempting to throw up in the trash can and there was nothing in the trash can? She said that he, she said something about the trash can and spit being in the trash can, yes. But she also said that she examined him and there was a tenderness in the lower right abdomen. In the video that we have, we don't see that. What we have is her saying to him, you're having a panic attack, which is totally different from what she told Judge Prater. Judge Prater could have taken just a couple of minutes to say, let's look at this. What's even worse is that the defense attorneys didn't even ask to talk to their client. They didn't ask Judge Prater for ten minutes to go over to Mr. Peters and say, what the heck's going on here? Are you truly in pain? Did the, didn't everybody, and I think including the defense attorneys, feel that he was faking? That's part of our ineffective claim. The defense attorneys agreed with the prosecutor and the judge that he was faking. How do they know that? Well, how do we know it here at the appellate court? Because we have the videotapes. Your honors can look at the same videotapes. I have them and we've looked at them. Right. So isn't our review for an abuse of discretion? No, it's de novo, your honor. It's de novo review. You're in the same position as Judge Prater was. And in that respect, you can look at those videos. With respect to that issue. Exactly. Exactly. There had been a history of him acting out in court on other occasions, correct? That's what Judge Prater said, but no, there really is not. When you read through the transcripts, there really, in my humble opinion, he was quite respectful to Judge Prater. He referred to her as ma'am or your honor. He never argued back to her. He was demanding, I do not deny that, but he was not disrespectful. And he was doing nothing to refuse his presence on that day of trial. Were there other medical issues on other occasions? Brought out by the prosecution in a motion, yes. The prosecution brought up a motion to prevent him from coming into court in his wheelchair. And the ultimate decision was that he could use his cane or I think they even said that he could come in the wheelchair, but it would be removed. He could sit at a chair at the table. There was no reason to not do that. So it was the prosecution that brought that up. The only medical situation that was brought up by the defense was his mental health, and that was very, very early on in the proceedings when the defense attorney filed a motion for a fitness evaluation. The results of that evaluation are actually in the record. They are impounded. I don't feel comfortable talking about that because they are impounded, but your honors can certainly review that. But in terms of Judge Prather's lack of, her more passionate method of dealing with the situation was to come to the conclusion that he was faking and tell him to shut up, to be quiet, to not tell her what was happening. She didn't even allow him the chance to say, I have this pain in my belt. He kept saying he needed a doctor, and in fact he did, because when they came back after eight witnesses testified, and that's the crux of this issue, that he was denied his right to confront those eight witnesses. One of whom, Dawn Wilson, who was the neighbor, was testifying about the lighting in the area at the time of the shooting. In closing arguments, defense attorneys said that Mr. Peters wasn't sure who it was who was standing outside of his house. He could have easily leaned over to his attorneys, given them a note, said, ask her about this, ask about the lighting, ask more about the lighting, focus on the lighting. He was not there to do that. Now, we have to look at this as plain error, because this was not raised below, correct? It was in the motions, but I'm admitting that it's questionable whether it was raised in the post-trial motions as an issue or just a statement. It was there, so yes, plain error does apply, yes. I appreciate your alleging ineffective assistance. I appreciate that, but for this issue, it has to be plain error if it wasn't raised. Yes, but also the concurrent ineffective assistance, yes, that's absolutely true, yes. But under RAB, this could be reviewed as plain error, because it was the absence from the trial, absence from the courtroom. I would also point out that the cases that Judge Prater relied on, Taylor and Johnson, really are distinguishable. Taylor was a case in which the defendant refused or was absent from court when court reconvened. I don't believe there's anything in the case about why he wasn't there. He just wasn't there. And on appeal, he was not even questioning confrontation. He was questioning, he was challenging just the unfairness of him not being there. We're saying that this is the next step. He was, Scott Peters was not allowed to be there, and he was denied his right to confront witnesses. The other witness that's important to keep in mind is Officer Hogan, who was the evidence tech, the evidence officer. He testified at length about the bulletproof vest and about how there was a bullet fragment in the front of the vest, in the chest area, and pictures were admitted into evidence and all that kind of stuff. Again, Mr. Peters, as difficult as he is and was, was former military. I'm sure the picture, you can see some of the pictures that he was wearing, flap jackets on the walls, the pictures on the walls, he knew about that kind of material. He could have, again, turned to his attorneys and said, ask this question. How could this have happened? Ask them. He was not there to do that. And the reason he was not there was because Judge Prater ousted him from the courtroom. He didn't refuse. This was not a voluntary decision on his part. He was merely alleging and telling the judge, I'm sick. I need to see a doctor. So that brings me back to your issue with respect to an elbow review on this video. So the video that we have, we reviewed, but isn't there more than just a video recording that would conclusively establish how much pain he was in? I mean, the witnesses testified, the court was there, there was an exchange. I mean, how is it that we, that this is not an abuse of discretion and it's, you're saying conclusively that it is de novo? The only witness who testified about the pain was Nurse McKay. And I know Officer Sova testified in the afternoon to Nurse Peters outburst. This wasn't an outburst. This was an ongoing, this was an ongoing presentation of pain. I don't know how else to describe it. He was in pain. How come though we look at the testimony of a nurse who says, yes, I examined him. This is what I saw. This is my opinion and so forth. How can we then sit in a sterile environment and say, well, look at this film. It might show this or it might not. And how can we say then that the judge erred in accepting the nurse's testimony as opposed to what we're going to interpret from this video? But what you have in the video and what was on the record by Nurse McKay are two different things. That's the point. Right. So, so how, why wouldn't that be a de novo review to say in one instance she's saying this and in another instance she's saying that. Two different things. Don't we have to weigh the two together? Don't we have to take into consideration? That would be de novo I would say, yes. You would say that's de novo? Yes, I would. So you're saying that it's de novo for us to review the nurse's testimony as well? It's there on the record, yes. You have everything before you. You're looking at it anew. De novo. And you're looking at it with the fresh eyes of these three justices as opposed to a judge who, I don't know how else to say this, she fell down the rabbit hole. He's a difficult person. She fell down the rabbit hole. He's a difficult person. And I'm sure he was, vernacular, a pain in the neck. But you still as a judge have to remain judicial and look at the entire scenario. She never asked him where the pain was. She never asked him, you know, point to what's hurting. She never did any of that. But she had a nurse tell on her. Some of those things, right? Well, he was there too. She could have asked him. Wasn't there other evidence that this defendant had a propensity to feign illness and exaggerate his pain? So do you think maybe the judge had had a proverbial belly full of him and maybe that's why she dismissed it? It doesn't make it right. It doesn't make it right, but it's different reasoning why she made her determination as opposed to us just reviewing it de novo. But it also comes down to whether you're looking at it as his refusal to be in the courtroom or some finding that he's faking. Whether he's faking it or not doesn't matter. The question is, was this his refusal to participate? And no, that was not there. He was not refusing. He never did refuse. He wanted this trial to proceed. And she kept saying that he was delaying the proceedings. The offense occurred on October 16th of 2014. This went to trial in April of 2015. That's not a long time. 14 to 15? October to April. Let me ask you, I'm sorry, I don't mean to cut you off. What's your second issue? Yes, I am. The second issue is the, excuse me, the Zare issue. And we've argued that Judge Prather erroneously and prejudicially conducted this idea by misstating the fourth Zare question and by misstating what the law is. In 2012, Rule 431B was changed to read, if a defendant does not testify, it cannot be held against him or her. What Judge Prather used during the voir dire was the old question. She asked the jurors, do you understand and accept the principle of law that the defendant's failure to testify cannot be held against him? Again. But it's not, when I read your brief, it's kind of like you put that out there as the only question that she asked. That question was asked in conjunction with all of the other Zare principles, was it not? Absolutely. But that question was a clear misstatement of what the law is. A defendant does not have to testify. Everybody knows that. There's two sides of that coin. There has to be an obligation for failure to exist. There is no obligation. There is no failure. He made the conscious choice that he was not going to testify. That's what the question should be. If a defendant does not testify and leave it at that, what she did was she took that extra step and misstated the law. So it's the connotation of using the word failure that you find errant. And again, this would be plain error. Yes. And we'd argue that actually, I know Glasper and Thompson are out there, but I would point out that in both of those, Glasper was under the old rule, the very old rule, when it was a matter of the defense attorney's request to the judge to ask the questions. Thompson reaffirmed Glasper, but again, one of those questions wasn't asked and the language was questionable and some of the other ones, but they weren't misstatements of the law. But in this case, the trial court judge said every defendant has a constitutional right not to testify and that jury may not draw any inference of guilt if the defendant fails to testify. So using that one word, fails, deprived him of properly informing the jury that he didn't have to testify. Yes. It implies that he had an obligation and the fact that he didn't put something in the jurors' minds that might have biased them. We don't know that for sure, but it might have biased them against him. Which brings me to my next question. Where's the prejudice? The prejudice is the closely balanced part of this concerning Officers Luna and Sackowitz. And we do talk about that in the brief. If you'd like, I can talk about it now. Sure. Okay. In terms of Officer Sackowitz, and if she's here, I give my respect to all the officers that are here. But Officer Sackowitz's testimony was she didn't even feel that she got shot in the leg. What she felt was a spanner on her chest as she was running away from Mr. Peters. It's not a grassy knoll situation. It's not an unusual, the bullet had to ricochet all over Creation before it hit her. If there was enough momentum, and this is physics and science, and I don't do that, but I think it's physics, if there's enough momentum of her running that the spanner from her leg where there were numerous fragments, according to the medical testimony, if that hit her in the chest, that's where the fragment came from. That's different than being shot in the chest. Being shot in the chest implies that somebody's standing in front of you or to the side of you and shoots you with a gun right in your chest. This was momentum. So there's close and balance on that. In terms of Officer Luna. Is this the first time that you argue close and balance on appeal? I mean, this is plain error, right? Right. Right. In terms of Officer Luna, is it the first time on appeal that it was argued this ricochet issue? No, I think that was brought up during the closing arguments. I'd have to look back, but I seem to recall a question of that being in the closing arguments. I'll look at that again. But your argument is the evidence here was closely balanced and therefore prejudice attached. Again, also with the evidence concerning Officer Luna, because the three officers arrived independently of each other at about the same time. Officers Madison Sackowitz went up to the door. Officer Luna went around to the side. Officer Luna could hear what was going on. There's no question of that. But when the shooting started, he came to take cover in between the vehicles that were in the driveway and the garage door. He could see a silhouette of a man, obviously Mr. Peters, through the bushes. There's no question. He also could see that Mr. Peters was aiming down the driveway toward the direction of Officers Madison as he ran and Sackowitz as she ran. He also heard the defendant say, are you ready to die? That's true. Toward the officers that Mr. Peters knew were there. He didn't know Officer Luna was there because he had taken cover to the side. There was no indication that he knew there was a third officer there. By the time Officer Luna is shooting at him, he knows he's there. Officer Luna made one shot, if I remember. I think he made eight shots. And then the gun jammed. And at that point, all shooting stopped. So he did not shoot in the direction. There were no bullet holes in the vehicles. There was nothing indicating that there was a shot in that direction. I've got one more question I want to go back to. Sure. Where you say that the admonishment that the trial judge gave regarding Rule 431, your statement is, you say that that was a misstatement of the law. Yes. Now, this is what I want to ask you. I'm concerned about how that could be an accurate statement and how that could be the case. Because she was using the language of Supreme Court Rule 431 that had been mandated. Now, it was changed in 2012. It had been mandated prior to that, correct? Yes. She had to use that language. No, she did not. She did. This trial was in 2013. No, no, no. I get that. Okay, now we're fast-forwarding two years and there's different language. Okay. But prior to that date, that language was mandated. Yes, it was. And it was an accurate statement of the law. No, it was not. At that time. Well, the Supreme Court told us it was, right? Well, the Supreme Court told us that that's what the rule required the question be. The United States Supreme Court law has always been, a defendant does not need to testify. There's no obligation for a defendant to testify. Let me get to the point of this whole question is this. What changed here was our Supreme Court saying, the language you judges should use to tell the jury what the law is has changed. Yes. Not the underlying law itself. No. That's always been the same. But the language of informing the jury what the law is has changed. Yes. You agree with that? Yes. So it's not the law itself changed. It's just the language, the verbiage that you as a trial court judge should use is this or this. Because it is. Both of which, though, are accurate statements of the law. No, I would disagree with that, Your Honor. They're not accurate statements of the law. If our Supreme Court is telling me to say that, I've got to assume that that's an accurate statement of the law. That's true, but they didn't have an appellate attorney come up and say this is not an accurate statement of the law. All right. Thank you. Thank you, Your Honors. We're asking for the relief that we've asked for. And you will have an opportunity for a rebuttal. Thank you. Thank you. Good morning, Your Honors. Counselor. May it please the Court. I would like to start out with an issue which we didn't, which counsel did not address just for a moment because I have a mistake in my brief that I want to clarify. And that is, in the closing argument, one of the issues brought up was a statement by our assistant that, I think everyone knows how I feel, but now it's your turn. And I said that was actually an invited comment because it had been, and that the language there, what I feel, came from something that was said by the other side. And I want to correct that. I think that was a cut-and-paste job by me that didn't go very well. That actually was said by the Court. But our argument is the same. And that is that the Court said right before that that what the attorneys say now in closing argument is not evidence. It is what they feel the evidence shows. And then our assistant took that and used that wording and said, you know what I feel. But he continued. And so it is to be taken in context, and that's our argument in the brief. He continued. He said, but now it's your turn. You judge the credibility of the witnesses. You do. That's your job. That's your role. So he was actually underscoring exactly what the judge had just said to him. It's taken out of context to say that he was, you know, personally vouching in some way or something. In the context in which it was said, it is clear he was saying just the opposite. He was saying, you know, whatever I feel, whatever my perspective, it's up to you. So I did want to correct that. And then moving on. Well, let's talk about the prosecutor. And I know, you know, that you sometimes get caught up in the excitement of a trial. Sometimes you step a little bit over the line. And in this case, this prosecutor is really taking this case seriously as he should. But when he said John Wayne over here draped in the American flag and he's a lying liar and he lies through his teeth, he's minimalizing, he's fabricating, he's fibbing, he's a lying liar. Don't believe a word he says. I mean, I think we can all appreciate, again, that you get a little bit fired up. But didn't he step over the line? Didn't he go a bit too far, Ms. Swiss? No, Your Honor. He did not. And here's why. Normally when we look at closing arguments, we have to look at whether or not they are shifting somehow the juror's attention away from the issues, away from the evidence, and, you know, and causing them maybe to return a verdict based upon passion or based upon, you know, what somebody's vouching. Well, say it was John Wayne, somebody spilled their blood in the service of the line of duty. Isn't that? That's all based on the evidence here. And that's what I think makes the difference. And the reason is, as counsel has just, you know, very openly, you know, admitted, we have an unusual defendant here. And he did, in a sense, drape himself in the flag. He was all about airborne, all about his service and about, you know, he used terms like that, he dressed like that. He pretty much deceived us. But isn't the prosecution to hold itself to a higher standard and not simply respond to what counsel characterizes as a very difficult defendant? Well, Your Honors, there is no doubt that that's true. But I don't believe the comments here went overboard. I believe that. We didn't select 14 dummies. You know what, Your Honors? Yes. You know what? And I'm not saying that that's the correct language used, but what I'm saying is here, when we talk about how he gave his full measure of devotion, he's talking about an officer who came not just because he spilled his blood and so that's his devotion to you or that you owe him something. He doesn't say anything like that. What he says is he's spilled his blood in devotion to you and to defendant. That's part of his sentence. And what he's saying is that he came here to do a well-being check. That is a community service, a public service to all of us. And we all know that those are services that our police officers routinely, you know, are involved in. In that doing, here's what happened. You know, his blood was spilled. And you make a good point. These are extremely important cases when you're dealing with the facts of the case. Here, all the more reason why a prosecutor should be more careful so that he or she doesn't put error in the record to cause a reversal on appeal. Correct? Well, Your Honors, absolutely. It's important for the prosecutor to toe the line and to make sure that it's not decided on something beyond the facts. But in this case, I would point to each one of these, and hopefully I did that in my brief. Each one of these statements is called out by the defense. And in each case, the line is going through the defendant's statement. It's saying, here's what he said, here's what's internally inconsistent, even within his own statement. So that is a clear case of lying. And here he is again saying this, but then later he says this, you know, in his statement again. And then, of course, we have some of the evidence, which also shows that he didn't, in fact, just fire a few bullets. He actually fired, I think, at least 17 casings came back to his gun. So it's based on the evidence, and I think that's what makes the closing argument a not error. Were any objections made of that closing argument? No, it was a plain error. It would be a plain error. You've gone through the statements and individually talked about each one, but a closing argument ultimately has to be judged, if you will, on its totality. Right. And so when you look at the myriad of statements by the prosecution. Well, you know, I would not call it a myriad. I would say it's a very lengthy closing argument. It's only the closing argument, but there were a number of statements. Shouldn't we look at them collectively? You may look at them cumulatively. There's no doubt that you have that ability to do that. But I would just go back to saying that it's our position that within the framework of the context of those, the full context of the remarks plus the context in which they were made, which always related back to the evidence here. It did not personally vouch for, you know, for some witness or some person over another. It did not try to suggest that there was some payback to the officers. None of that was involved in the normal cases where you see some sort of prosecutorial misconduct. You know, as my colleague mentioned, we didn't pick 14 dummies. Isn't the inference to the jury, well, you're a dummy if you don't see it from the prosecution's point of view. Is that proper? Your Honor, obviously, that's not a comment that, you know, that should be made at, you know, in the closing argument. However, in the context here, with all of the evidence that there is, it's overwhelming evidence, we feel that there is certainly it's not plain error in this case. And most of the comments, if not all of them, can be traced directly back to the evidence in this case. Is it ineffective assistance for his lawyer not to have objected to that? No, Your Honor, for the very reason I've just stated, which is I think that given that, you know, these comments were, for the most part, directly related to the evidence. I don't believe there was ineffective assistance. Wouldn't have changed the outcome of the case. Right. Exactly. Prejudice. Going back to the right to be present and the confrontation clause, we rely on Illinois v. of the judicial proceedings is threatened where the trial cannot go on. And certainly in this case, that's where they were at. That at that point, the defendant loses his right to be present. And that we're looking at that not de novo. I have to totally disagree with that standard. But we are looking at for abuse of discretion. And the reason is, excuse me, while we have a tape that shows some of the facts and that could be reviewed by your honors. We've reviewed it. Okay. That's certainly part of the evidence, but that's not all the evidence. What we have here is we have the trial judge trying to make a good determination, calling the nurse, asking, first of all, if there were any other people that had been involved in this and have seen the defendant. They apparently were off shift. Then saying to the nurse, you know, tell me what your opinion is, what you've done about it, asking all sorts of questions. And the nurse said that she had given him an exam. Now, that's not on that tape that we have. So we have her word for what occurred during the exam. And she says that he had a hernia, that he has had a hernia for quite some time, and that there was a tenderness there. Did he have that hernia back in October? Do we know? Back in October during this? In October of 2014, let's say the date of the arrest. Yes. Did he have that hernia at that time? Do we know that? That we don't know. Okay. No, we don't know exactly when, but she said he had had it for some time. So clearly this was not something that had just happened to him, you know, within the last day or two. And she said, you know, that, well, in fact, counsel has also stated in a brief, normally they are asymptomatic. Normally a person with a hernia does not have that type of pain that would cause them to cry out. Now, that doesn't mean that the court stopped it and said, well, a hernia is a hernia. The court engaged in a long questioning and listened carefully to Nurse McKay about the exam, about what she had found, about what her opinion as to whether or not he had some type of medical condition that needed something further. And the answer to that was no. This nurse sees the defendant later, and that's on the tape. And at that point he's, again, causing an outburst when he's with the officers who are trying to take him to change into clothing for the, to come to the hearing. But, or excuse me, to come to the trial. But that's a different point. That's at 9-something. She says she saw him right after she got in, I think around 8 o'clock. So we don't know the exam. We have her word for the exam. And her word is that there was nothing really wrong with him that would keep him from participating. More than that, he was complaining of vomiting. And she said that is what might be causing, you know, more tenderness, more pain, if you will, in the area. But he was causing the vomiting. He drank at least four cartons of fluid. We see that on the tape. He then proceeded to, what the nurse decided was just to try to vomit and was, in fact, spitting up, basically. So there was spit in the waste paper basket. Nothing much more. She said there was a tiny bit of something more, but basically spit. And I think the judge is confronted with those facts. He is in court. He is not merely trying to speak up to the judge. He is yelling over her. He is slumped, will not dress. And the question is, of course, is he unable or unwilling? And we have to leave it to the court to make that determination. That court had several encounters with this defendant before, had heard in, you know, regarding the motions in Limine about whether, excuse me, it was a prior motion by the state to keep the defendant from coming in in a wheelchair. And during that testimony by the doctor who had observed him, that doctor said that there was no reason he couldn't, that he just didn't want to. So would it have been hard for the judge to wait an hour to see how he was feeling, give him some time? You know, Your Honor, I don't think that's a test. You know, whether you can say, let's give it a few hours and see. There was no reason to believe that he was going to change the way he was acting. I mean, even after the court, who was interrupted three times in trying to make a simple statement that the way you're acting, we can't go on and this will be taken as a waiver. She couldn't even get that statement out because he kept interrupting. She'd say two words and they'd interrupt. They'd have to stop. Two more words and they'd have to stop. And we review that decision for an abuse of discretion. I'm sorry. We review that decision for an abuse of discretion. An abuse of discretion, absolutely. And so she has prior knowledge that he has maybe, you know, possibly exaggerated, you know, his illnesses before. Certainly, I pointed out in my brief, too, there was another, just a continuous, I believe, and at the end of it, he's yelling out, my head, my head. As he is told here that this will be considered a waiver, he starts to, you know, continues to yell out that he needs someone to look at his stomach. He needs medical care. But as soon as she says, you know, that's not going to happen, he then says, my head, my arms are numb, something of that sort. So it's clear that this is somebody who is able but unwilling to come. And I believe that even the fact that he came back to court and was perfectly fine in the afternoon shows that there is no abuse of discretion in this case. I have here in my notes, and I think I must have taken from your brief, that there had been a psych eval in January of 2015. And the court was aware of that and had read that evaluation. Is that correct? Yes, I believe the court said at some point that it had read the evaluation. So the inference there is that she is aware of that, of course, on the day of the trial. Right, that he has a tendency to exaggerate. That he has a tendency to magnify his illnesses. Yes. Yes. If I may turn very quickly to the Zara issue, since counsel has argued that point. First of all, we definitely dispute whether or not the word failure necessarily means that he had an obligation and did not do that. But to the extent that there could be any ambiguity in that word to suggest that, it's taken away by the fact that the jurors heard from the judge that every defendant has a constitutional right not to testify. And the jury cannot draw an inference of guilt if he fails to do so. By putting that together, he has indicated the meaning of fails. He has a constitutional right. But if he doesn't do so, it's clear that that's the way fails is used within the context of what the judge is saying. And again, there was no objection raised at the time to allow the court to clarify. To clarify that, exactly. So again, a plain error analysis, right? Yes, I believe that is a plain error analysis also. Also, they were instructed right before their deliberations, of course, by the court again. And that was that they could not consider the defendant's decision not to testify, cannot be considered in reaching a verdict. So again, they were told this. There is a presumption that the jurors follow the law unless there's something to show otherwise. And so under those circumstances, there certainly is no showing of prejudice here or something that would show plain error. So I'll let your honors have other questions. We would ask the court to affirm the defendant's convictions and sentences. Thank you very much. Counsel, do you wish to offer a rebuttal? Yes, ma'am. As to the closing argument issue, Justice Shostak made a statement that perhaps the prosecutor stepped over the line. And I would wholeheartedly agree with all of the various comments that you pointed out in our brief. The dummies comment, the telling the jurors after, and admittedly this was in response to an argument by defense counsel, but telling the jurors that they really didn't have to comb the record, they didn't have to really look at the evidence. Yes, they do. That's their obligation. That's their job. And that's what they're there for. And if the prosecution is going to submit 200 some odd pieces of evidence, then yes, they need to carefully look at all of that evidence. So yes, the prosecutor did step over the line. And considering the magnitude of this case in particular, all the more reason for the prosecutor to be that much more careful about what is said in closing arguments. Other than that, I'm going to rely on that argument, if that's all right. As to argument four, issue four, under either de novo or abuse of discretion, we're saying that he didn't refuse to participate, and that's what this comes down to. Well, didn't it, didn't it, I mean, his refusal to participate is different, like, I don't want to take part in these proceedings. I'm leaving, versus becoming so obstinate and loud and unruly and challenging the court that, based upon the case law, equals a failure to participate. But as Your Honor said, couldn't they have just taken an hour? Taken an hour and do what Nurse McKay actually did after he went back to the jail cells. Deputy Soba came in after the lunch break and said, Nurse McKay pushed the hernia back in. Now, I don't have a hernia. I don't necessarily know what that means. But to me, that sounds bad, that something had to be pushed in, and that it was causing pain. And even though he might have a tendency to exaggerate, the fact is he was in pain. And he had a medical situation that needed to be looked at, and that they could have taken that hour to look at it. It was looked at, though, by the nurse, right? As witnesses were testifying. He was missing out on the eight witnesses who testified. If they had taken that hour, and if Nurse McKay looked at it and pushed the hernia back in in the morning during that hour, then they could have continued and he could have been there for the eight witnesses, and his constitutional right would not have been violated. And that's what this comes down to. My point is, the proof's in the pudding, in that because the nurse did offer treatment, which appears to have worked because at 1.30 he appears to be fine, that that's evidence that he was not faking, and in fact had a distress that was remedied. Yes. And I'd also point out, again, I go back to, it really doesn't matter if he was faking. It's his refusal. Faking is part of it. I'm not saying it's totally removed, but it's his refusal. All of this occurred before any jurors were in the courtroom. He may have been feeling ill. Was he given the opportunity to participate in the trial that morning? No. He was brought in, and all of this was brought to Judge Prather's attention before any jurors were in. Who knows? He may have been able to control his pain. As difficult as Mr. Peters is, I admit that might be far-fetched. I admit that. But he could have controlled his pain, and he could have reasonably participated in his trial and not missed out on those eight witnesses, two of whom were material to his defense. So that's where the problem lies, that he was denied his confrontation. The only thing I have to add about Argument 3 is that, yes, the judge admonished the jurors that before their deliberations that the defendant didn't testify and so on. I'm not even going to try and pronounce that case name. This Court issued that decision saying that doesn't cure it. And you can't comment on a defendant's, I might be referring to the law, but you can't, that doesn't cure the error that already occurred. If you find that that's an error. Yes. But it also, the misstatement of the law in that question relates also to the closing arguments with the prosecutor saying he's a lying liar, all that stuff. If he's not testifying, and he has this obligation to testify, and he fails to testify, well then, yeah, maybe he is lying. And that's what's going through the jurors' minds. It all ties together. This is a cumulative effect. And we're asking that Your Honors look at Actually, you did not make a cumulative argument in your brief. I believe I did at one point, Your Honor. Okay. Then I'll look again. I'll take your word for it. Okay. I believe I did. But yes, Your Honor brought it up. And yes, you can look at all of the statements in the closing argument, and all of this ties in because one issue leads into the other. Again, we ask for the relief in the brief. And thank you. Thank you, both of you, for your arguments. We will be in a brief recess until our next case.